# EXHIBIT A


## Service of Process Transmittal Summary

**TO:** Paulette Smith
Tyson Foods, Inc.
2200 W DON TYSON PKWY # 131
SPRINGDALE, AR 72762-6901

**RE:** **Process Served in Missouri**

**FOR:** Tyson Deli, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: VICKIE OWNBY // To: Tyson Deli, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | In The 15th Judicial Circuit, Lafayette County, Missouri, MO<br>Case # 22LFCV01005 |
| **NATURE OF ACTION:** | Employee Litigation - Discrimination |
| **PROCESS SERVED ON:** | C T Corporation System, Clayton, MO |
| **DATE/METHOD OF SERVICE:** | By Process Server on 11/22/2022 at 17:15 |
| **JURISDICTION SERVED:** | Missouri |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S)/SENDER(S):** | Ross H. Briggs<br>4144 LINDELL BLVD<br>STE 202<br>SAINT LOUIS, MO 63108<br>314-652-8922 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/23/2022, Expected Purge Date: 11/28/2022 |
| | Image SOP |
| | Email Notification,  Jane Duke  jane.duke@tyson.com |
| | Email Notification,  Adam Deckinger  adam.deckinger@tyson.com |
| | Email Notification,  Brittany Pettingill  brittany.pettingill@tyson.com |
| | Email Notification,  Paulette Smith  paulette.smith@tyson.com |
| | Email Notification,  Sue Arens  sue.arens@tyson.com |
| | Email Notification,  Eli Glasser  eli.glasser@tyson.com |
| | Email Notification,  Leigh Anne Yeargan  leighanne.yeargan@tyson.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>120 South Central Avenue<br>Clayton, MO 63105 |


877-564-7529
MajorAccountTeam2@wolterskluwer.com

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                               Tue, Nov 22, 2022
**Server Name:**                        David May

| Entity Served | TYSON DELI, INC. |
|---|---|
| Case Number | 22LF-CV01005 |
| Jurisdiction | MO |

| Inserts | | |
|---|---|---|
| | | |





# IN THE 15TH JUDICIAL CIRCUIT, LAFAYETTE COUNTY, MISSOURI

| Judge or Division:<br>DENNIS ALLEN ROLF | Case Number: 22LF-CV01005 |
|---|---|
| Plaintiff/Petitioner:<br>VICKIE OWNBY | Plaintiff's/Petitioner's Attorney/Address<br>ROSS HARRY BRIGGS<br>4144 LINDELL BLVD<br>STE 202<br>SAINT LOUIS, MO 63108 |
| vs. | |
| Defendant/Respondent:<br>TYSON DELI, INC | Court Address:<br>LAFAYETTE COUNTY COURTHOUSE<br>1001 MAIN<br>P O BOX 10<br>LEXINGTON, MO 64067 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: **TYSON DELI, INC**
**PLEASE SERVE RA: CT CORP SYSTEMS**
**120 S CENTRAL AVE**
**CLAYTON, MO 63105**

**2200 W DON TYSON PKWY**
**#CP131**
**SPRINGDALE, AR 72762**

*COURT SEAL OF*

**LAFAYETTE COUNTY**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

/s/ Kim Mason, Circuit Clerk
by Kelly Beckner, Deputy

_____11/10/2022_____     _____
Date                                                         Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer**: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.
☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.
☐ (for service on a corporation) delivering a copy of the summons and petition to:
_____ (name) _____ (title).
☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                          Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
Date                                              Notary Public

| Sheriff's Fees, if applicable | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00____ | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SJRC (07-21) SM30 (SMCC) *For Court Use Only:* **Document ID # 22-SMCC-460** 1 of 1 (22LF-CV01005)     Civil Procedure Form No. 1, SCR 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:22-cv-00847-DGK   Document 1-1   Filed 12/21/22   Page 5 of 41



# IN THE 15TH JUDICIAL CIRCUIT, LAFAYETTE COUNTY, MISSOURI

| Judge or Division:<br>DENNIS ALLEN ROLF | Case Number: 22LF-CV01005 |
|---|---|
| Plaintiff/Petitioner:<br>VICKIE OWNBY | Plaintiff's/Petitioner's Attorney/Address<br>ROSS HARRY BRIGGS<br>4144 LINDELL BLVD<br>STE 202<br>SAINT LOUIS, MO 63108 |
| vs. | |
| Defendant/Respondent:<br>TYSON DELI, INC | Court Address:<br>LAFAYETTE COUNTY COURTHOUSE<br>1001 MAIN<br>P O BOX 10<br>LEXINGTON, MO 64067 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  **TYSON FOODS, INC./CTCORP**
**PLEASE SERVE RA: CT CORP SYSTEMS**
**120 S CENTRAL AVE**
**CLAYTON, MO 63105**

**2200 W DON TYSON PKWY**
**STE CP131**
**SPRINGDALE, AR 72762**

*COURT SEAL OF*

*LAFAYETTE COUNTY*

**You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.**

_____11/10/2022_____      /s/ Kim Mason, Circuit Clerk
                                              by Kelly Beckner, Deputy
_____

Date                                          Clerk

Further Information:

## Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to: _____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____      _____
Printed Name of Sheriff or Server                       Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____      _____
                         Date                             Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | **$_____** |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SJRC (07-21) SM30 (SMCC) For Court Use Only: Document ID# 22-SMCC-461    1 of 1  (22LF-CV01005) / Civil Procedure Form No. 1, SCR 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:22-cv-00847-DGK   Document 1-1   Filed 12/21/22   Page 6 of 41

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

**15th JUDICIAL CIRCUIT OF MISSOURI**
**Lafayette County**

| | |
|---|---|
| VICKIE OWNBY, an individual, | ) |
| | ) |
| Plaintiff, | ) Case No. _____ |
| | ) |
| v. | ) |
| | ) **PETITION** |
| TYSON DELI, INC. | ) |
| | ) **[JURY TRIAL DEMANDED]** |
| Serve: CT Corporation System | ) |
| Registered Agent | ) |
| 120 South Central Ave. | ) |
| Clayton, MO 63105 | ) |
| | ) |
| and | ) |
| | ) |
| TYSON FOODS, INC., | ) |
| | ) |
| Serve: CT Corporation System | ) |
| Registered Agent | ) |
| 120 South Central Ave. | ) |
| Clayton, MO 63105 | ) |
| | ) |
| Defendants. | ) |

## INTRODUCTION

1.      Article I, Section 5 of the Missouri Constitution states that "all men and women have a natural an indefeasible right to worship Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the rights of conscience; . . . nor shall a citizen's right to pray or express his or her religious beliefs be infringed . . ."

1

2. Federal and Missouri state law has been created to mirror these civil rights in many settings, including employment, to safeguard individuals' religious liberties.

3. Tyson Deli, Inc. and Tyson Foods, Inc. (collectively "Defendants") have elected to woefully violate these safeguards, at the expense of their loyal employees, with no possible justification for doing so.

4. Defendants have discriminated against Plaintiff based on her religious objections to taking the experimental mRNA COVID-19 vaccine.

5. Defendants have also discriminated against Plaintiff based on a perceived disability of having no vaccination-induced immunity.

6. Plaintiff Vickie Ownby seeks relief from Defendants' pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious exemptions from Tyson's COVID-19 vaccination mandate policy.

7. On August 3, 2021, Tyson Foods, Inc., and by extension Tyson Deli, Inc. as its subsidiary, imposed a draconian vaccine mandate for all employees. Defendants' mandate addresses a very remote risk with an ineffective means.

8. Defendants responded to their employees seeking medical or religious exemptions by informing those employees that they would be effectively terminated on November 1, 2021 and placed on unpaid leave of absence with no assurance that they would be allowed to return.

9. Defendants' unlawful actions left Plaintiff with an impossible choice: suffer a physical assault and uninvited invasion of her body by receiving an experimental

2

COVID-19 biologic, at the expense of her religious beliefs, bodily autonomy, medical privacy, and possibly health, or lose her livelihood.

10.    This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Missouri civil rights law.

## PARTIES

11.    Plaintiff Vickie Ownby was employed at Tyson Deli, Inc in Concordia, Missouri. She began working for Tyson Deli in September 2000. Plaintiff submitted a request for a religious exemption and accommodation to Defendants' COVID-19 vaccine mandate. Ownby suffered an adverse employment action by being placed on unpaid, unelected, and unprotected leave of absence on November 1, 2021. Plaintiff resides in Sweet Springs, Missouri.

12.    Defendant Tyson Deli, Inc. ("Tyson Deli") is a subsidiary company of Tyson Foods, Inc. located in Concordia, Missouri. Tyson Deli, Inc. is incorporated in the state of Delaware. Tyson Deli's principal headquarters are located at 2200 W. Don Tyson Pkwy CP 131, Springdale, AR 72762-6901. Tyson Deli is registered to do business in the State of Missouri, and CT Corporation, 120 South Central Avenue, Clayton, Missouri 63105 is its registered agent.

13.    Defendant Tyson Foods, Inc. ("Tyson Foods") is a corporation that operates as a worldwide food processing and marketing company. Tyson Foods is the world's largest processor and marketer of chicken, beef, and pork. Tyson Foods employs approximately 139,000 people in the United States. Tyson Foods is incorporated in the state of Delaware. Tyson Foods' principal headquarters are located at 2200 W. Don Tyson Pkwy

3

CP 131, Springdale, AR 72762-6901. Tyson Foods is registered to do business in the State of Missouri, and CT Corporation, 120 South Central Avenue, Clayton, Missouri 63105 is its registered agent.

14. At all relevant times, Defendants knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to Mo. Ann. Stat. § 478.070.

16. Venue is proper in this judicial district pursuant to Mo. Ann. Stat § 506.290 because the cause of action arises primarily from Tyson Deli's Concordia, MO location situated in Lafayette County.

## FACTS AND BACKGROUND

**Coronavirus and Tyson's Response**

17. In the spring of 2020, Defendants began implementing mitigation procedures for its workforce, including several of the following requirements for its employees: masks, face shields, social distancing, temperature checks, COVID-19 testing, and self-quarantines. Tyson initially made several accommodations for hourly employees. For example, in March of 2020, the company relaxed attendance policies in its plants by "[]eliminating any punitive effect for missing work due to illness."

18. Tyson experienced substantial success reducing the risk of COVID-19 spread through self-quarantining for the symptomatic and testing for the asymptomatic persons. As even Anthony Fauci admits, the risk of asymptomatic spread is very rare and very

4

low, with experts estimating it is largely a non-existent risk. At worst, asymptomatic risk of employees spreading lethal COVID-19 is less than one-in-a-million.

19.     Even in that one-in-a-million risk, testing easily addresses asymptomatic risk without requiring bodily invasion against a person's will of an experimental drug with severe known and unknown long-term side effects due to its novel mRNA methodology, with the worst short-term adverse events reported in the government's VAERS database in American history, and whose administration offends the conscience of millions of Americans' deeply held spiritual beliefs and religious faith due to the use of aborted fetal cells in its testing, development and production of each of these experimental vaccines.

20.     Despite this, after sixteen months of effective measures, Defendants opted to disregard empirical evidence and scientific studies, and implemented a mandate requiring bodily invasion against a person's will.

**Tyson's Unlawful Vaccine Mandate**

21.     We face an unparalleled moment in history, when employers have mandated an experimental vaccine that utilizes novel technology and, not only has conferred little to no benefit to recipients but has injured hundreds of thousands of individuals if not millions who elected or were forced to receive the vaccine by virtue of mandates exactly like Tyson's.

22.     On approximately August 3, 2021, Tyson publicly announced it would require all "[]team members at U.S. office locations to be fully vaccinated by October 1, 2021." Tyson also announced that all other team members would be required to be vaccinated by November 1, 2021.

23.     Tyson publicly stated that "Exceptions to the vaccination mandate will involve workers who seek medical or religious accommodation."

24.     To seek an exemption, Defendants required employees fill out an official form and turn it into the HR department. Defendants also allowed for an accommodation letter to be sent to the HR department as well as to the plant managers.

25.     Defendants offered those who applied and were granted an accommodation an unpaid leave of absence for up to one year or until they received the vaccine. They were informed that after one year they would be effectively terminated from their position at Tyson. *Ibid.* Tyson employees were also informed that even if they did receive the vaccine their positions would not be guaranteed. *Ibid.*

26.     Under this policy, employees were constructively terminated as they were denied access to work and received no compensation or benefits.

27.     Defendants' mandate is uncompromisingly harsh. Tyson provides no alternative for remote work, periodic testing, mask wearing, social distancing, or exemptions for employees who have recovered from COVID-19 and have natural immunity, even though Tyson successfully protected its employees and reduced the spread of COVID-19 using many of these measures for over 18 months.

28.     Defendants have exercised substantial authoritarianism, pressure, and coercion against employees to enforce its unlawful vaccine mandate, at the expense of employees' personal autonomy, medical freedoms, and sincere religious beliefs.

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

29. As a way to influence employees, Tyson sponsored incentive programs to encourage employees to take the COVID-19 vaccine, including raffles, paid time off, and other monetary awards. These programs were unavailable to unvaccinated employees.

**Tyson's Vaccine Mandate Will Not Stop the Spread of COVID-19**

30. Defendants implemented their mandate under the guise of protecting employees from COVID-19. However, studies at the time the mandate was implemented and since demonstrate that the COVID-19 vaccine was ineffectual at achieving those ends.

31. The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

32. A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2947 counties in the United States found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Nor was there a significant indication of "COVID-19 cases decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."

33. Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.

34. Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity. Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

35.     A paper published in *Eurosurveillance*, a journal published by the European

Centers for Disease Control, documents a significant outbreak of COVID-19 among fully

vaccinated patients and staff at a hospital in Tel Aviv. At the time of the outbreak,

investigators determined 238 out of 248 of exposed patients and staff had been fully

vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed

vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people

- a difference that doesn't reach statistical significance because the unvaccinated group is

too small. Of the infected, 23 were patients and 19 staff. The staff all recovered quickly,

but five patients died and another nine had severe or critical cases. ***All were vaccinated***.

On the other hand, the two unvaccinated infected patients both had only ***mild*** cases of

COVID-19.

36.     A senior Pfizer executive just recently admitted that they did not even know

whether their mRNA COVID-19 shot stopped transmission before they began

administering it to the public.

37.     It should, therefore, come as no surprise that in their real-world application the

vaccines have not shown that they are effective at stopping infection or preventing

vaccinated persons from spreading the virus.

38.     As the New York Supreme Court recently recognized, "[b]eing vaccinated does

not prevent an individual from contracting or transmitting Covid-19." <u>Garvey v. City of</u>

<u>New York</u>, No. 85163/2022, 2022 WL 16559102, at 7 (N.Y. Sup. Ct. Oct. 24, 2022).

Furthermore, they found "nothing demonstrated in the record as to why there was a

vaccination mandate" implemented for public employees in October 2021 and that [t]he

8

vaccination mandate for City employees was not just about safety and public health; it was about compliance." *Id.* at 3, 7. The situation here is the same.

**Natural Immunity is Durable, Lasting, and Superior to Vaccination**

39.     Furthermore, vaccination could interfere with that natural immunity employees could acquire from exposure to and recovery from SARS-CoV-2.

40.     Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

41.     There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered. However, Defendants wholesale disregard the relevance of natural immunity entirely.

42.     A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.

43.     Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19. More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to ***13 times more likely to contract the virus than those who were previously***

9

*infected with the virus* and that "natural immunity confers longer lasting and stronger protection against infection."

44. Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population. Not one of the 1359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.

45. The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).

46. Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

47. Defendants knew or should have known of this early research at the time it implemented its vaccine mandate.

48. Forcing Plaintiff, who may have had natural immunity, to receive the COVID-19 vaccines would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

10

**Vaccination Poses Substantial Health Risks**

49.     All three of the available COVID-19 vaccines available in the United States are marketable under Emergency Use Authorization ("EUA") and based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were administered to the public. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

50.     Though the FDA has approved the use of Comirnaty for future use, Pfizer has admitted that Comirnaty is not currently available to the public.

51.     There has never been a successful coronavirus vaccine in history.

52.     Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which this drug can any longer claim credit for.

53.     Recent reporting data presents an alarming picture: as of the time of this filing, there have been 31,446 deaths reported to VAERS from COVID-19 vaccines and 1,591,545 total adverse events.

54.     The input of event reports to VAERS since the COVID vaccines were rolled out is *far greater than all cumulative adverse event reports to VAERS for the prior 30 years*: an alarming statistic.

55.     This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual

11

adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so. The CDC has failed to account for this underreporting.

56.     Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1%.

57.     COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

58.     Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in young males. Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

59.     COVID-19 vaccines increase the risk of contracting COVID-19 and damage the immune system of the recipient.

60.     Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood brain barrier.  It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

61.     We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries. Since there exists no way to

12

turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person. Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

62. The potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Defendants' mandate are not theoretical, hypothetical or academic—they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

63. The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

**Tyson's Discriminatory Treatment of Plaintiff**

64. Vickie Ownby was a loyal employee of Tyson Deli for more than 21 years and performed her job admirably during her tenure.

65. Upon Tyson's implementation of its company-wide vaccination policy, Ownby was subject to the November 1, 2021 deadline to be fully vaccinated.

66. Ownby objects to the COVID-19 vaccine on religious grounds and adhering to Defendants' vaccine mandate would have violated her religious beliefs.

67. On September 20, 2021, Ownby submitted a religious exemption and a request for an accommodation.

13

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

68.      Ownby was willing to work with Tyson Deli to agree on an accommodation that would guarantee the safety of her and her coworkers but would not require her to violate her sincere religious beliefs. Accommodations offered by Ownby included but was not limited to wearing a mask and submitting to regular COVID-19 testing.

69.      A few weeks after submitting her request, Ownby received a letter from Tyson Deli informing her that her request for accommodation had been approved. *See* Exhibit A. However, the letter did not specify any specific accommodations other than unpaid leave of absence.

70.      Ownby was informed by HR representative Janet Fowler that she would be placed on unpaid leave of absence.

71.      On October 11, 2021, Ownby submitted a second accommodation request and an objection to the offered "accommodation" and requested that Tyson Deli define why the specific accommodation I requested was denied. She expressed that unpaid administrative leave is not an acceptable accommodation and indeed is no accommodation at all.

72.      Tyson Deli never responded to Ownby's objection nor received an explanation as to why her proposed accommodations were denied.

73.      Ownby was placed on unprotected, unpaid, and unelected leave of absence on November 1, 2021. *See* Exhibit B.

74.      On November 2, 2021, Ownby reported to work and was prohibited entry to the building. HR Representative Janet Fowler publicly declared in the presence of other employees that Plaintiff was not allowed on the property because she was unvaccinated.

14

75.     On the same day, Ownby spoke with Janet Fowler on the telephone, and Fowler confirmed that Tyson was unwilling to consider any other accommodation other than an unpaid leave of absence.

76.     Defendants did not engage in the interactive process with Ownby, made no attempt to consider alternative accommodations, and did not conduct an individualized assessment of Plaintiff's circumstance.

77.     Defendants only offered unpaid leave as an accommodation, which is no accommodation at all, but an adverse employment action tantamount to termination.

78.     Tyson's actions have caused severe financial and emotional hardship for Plaintiff, namely losing her wages and benefits, but also being subject to discrimination and ostracization at the hands of Tyson. Defendants' discriminatory and retaliatory actions have caused Plaintiff to suffer various harms, including a substantial loss of income, loss of professional advancement opportunities, not to mention the loss of a substantial twenty-two-year career at Tyson.

79.     At the time of this filing, Plaintiff remains on unpaid leave.

80.     Plaintiff filed an employment discrimination complaint with the Missouri Commission on Human Rights, dually filed with the Equal Employment Opportunity Commission ("EEOC"). *See* Exhibit C. Ownby was granted a Right to Sue Letter on August 10, 2022. *See* Exhibit D. This suit has followed.

**COVID Vaccines Violate Plaintiff's Religious Beliefs**

81.     Plaintiff holds sincere concerns surrounding the process used to manufacture the vaccines and in the administration of an experimental mRNA vaccine.

15

82.    Plaintiff beliefs that God made humans in his image, and any alteration or

manipulation to the human DNA is in direct violation of her beliefs.

83.    Plaintiff objects to the COVID-19 vaccine because it was created using human

embryonic cell tissue acquired from aborted fetuses.

84.    Presently, all COVID-19 vaccines have made use either in production or testing of

fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).



**Los Angeles County**
**COVID-19 VACCINE AND FETAL CELL LINES**

In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells
originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived
from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith
communities and among individuals with concerns about the ethics of using materials derived in this
way.

85.    For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically

PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.

86.    In an interview with WREG, Dr. Steve Threlkeld, president of the medical staff at

Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or

test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an

aborted fetus in the 70s or 80s and there are several of these cell lines."

87.    The Louisiana Department of Health likewise confirms that the Johnson &

Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line

that was isolated from a terminated fetus in 1985."

88.    As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293

was used during the research and development phase. All HEK 293 cells are descended

from tissue taken in 1973 from either an elective abortion or miscarriage that took place in the Netherlands.

89.     While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

90.     Plaintiff believes that abortion is murder and that to murder or benefit from murder in any way is a sin.

91.     Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on religious grounds to accept or be forced to accept the COVID-19 vaccines.

**Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

92.     The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See, e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

17

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

93.     Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234

(2016), the employer agreed to pay $300,000 to a class of six aggrieved former

employees and provided substantial injunctive relief to settle a religious discrimination

lawsuit based upon a failure to grant a religious exemption as part of a mandatory

seasonal flu vaccination requirement for its employees.

94.     Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523

(2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in

compensatory damages and $20,000 in punitive damages) for refusing to hire a medical

transcriptionist because of her religious beliefs against receiving flu shots and refusing to

accommodate those beliefs.

95.     In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission

sued Nashville-based Saint Thomas Health, after the employer failed to make a

reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*,

Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

96.     The *Saint Thomas Health* case resulted in consent decree enjoining the employer

from failing to provide religious accommodations to an employee's sincerely held

religious beliefs unless such requests created an undue hardship. The decree also awarded

the injured employee $75,000 in damages and directed the employer to issue the

employee an apology letter.

97.     Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit

granted a stay of the Occupational Safety and Health Administration's nationwide

vaccine mandate, stating that the mandate "raises serious constitutional concerns" and

that "a denial of the petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." *BST Holdings v. OSHA*, Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

**Tyson's Mandate Continues the Inglorious History of Medical Experiments**

98.     Born amidst malaria and smallpox pandemics, the Constitution authorized no emergency exception to the liberties secured under it.

99.     The Founding Fathers understood the virus of concentrated power posed more of a threat than any biological virus could.

100.    The Ninth Amendment to the Constitution safeguarded all ancient rights and liberties, including the ancient tort of battery. United States Constitution, Amendment IX.

101.    The right against battery assured "the right of every individual to the possession and control of his own person, free from all restraint or interference of others," which would be "sacred" and protected under the law. *Union Pacific R. Co. Botsford*, 141 U.S. 250, 251 (1891).

102.    The famed Justice Cardozo defined the doctrine as the universal right of every person "to determine what shall be done with his own body." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (1914).

103.    This right to informed consent incorporates necessarily the right to refuse treatment: "The forcible injection of medication into a nonconsenting person's body

represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990).

104.    The Nuremberg Code enshrines the right of informed consent as a matter of universal law, so widely recognized, courts consider it a jus cogens legal principle enforceable everywhere. *Abdullah v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009).

105.    Based on these precepts, courts require clear and convincing evidence that a person poses an imminent, severe risk to others before those individuals may be subject to forced medical care. *O'Conner v. Donaldson*, 422 U.S. 563 (1975); *Addington v. Texas*, 441 U.S. 418 (1978).

### Eugenics Era

106.    We only deviated from this Informed Consent standard of medical care during the Eugenics Era, a diseased doctrine birthed in the medical academies of the United States at the turn of the last century, as a deformed outgrowth of the then in-vogue school of Social Darwinism.

107.    A trio of decisions carved out emergency exceptions to Constitutional liberties, including authorizing a fine for not taking a vaccine (*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)), forced sterilizations of poor and politically unprotected populations (*Buck v. Bell*, 274 U.S. 200 (1927), which relied exclusively on expanding Jacobson), and culminated in the kind of "emergency exception" logic that led a court to authorize forced detention camps. *Korematsu v. United States*, 323 U.S. 214 (1944).

20

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

108.    This trilogy of infamy sees its corpses rise again as "precedents" seemingly permitting governments to reinstate Eugenics-Era logic across the legal landscape. Indeed, recent governmental defendants cited the forced sterilization decision in Buck as the basis for forced vaccine mandates of teenagers. *Buck v. Bell*, 274 U.S. 200 (1927).

### Nuremberg Code Era

109.    Reeling from the moral horror of the Nazi regime, and its enthusiastic embrace of eugenics, American jurists led the way in reestablishing the Constitutional order by invalidating the Eugenics-Era precedents and by instituting the Nuremberg Code of 1947, whose governing principles of Informed Consent for all matters of medicine form a jus cogens principle of universal, internationally recognized law, enforceable amongst all civilized nations, as federal courts established.

110.    The right to bodily autonomy formed the foundation for Supreme Court recognition of the right to privacy and guided the standards governing all matters of medical care concerning the state. Only clear and convincing evidence of an imminent danger to others justifies forced medical care. *Washington v. Harper*, 494 U.S. 210, 229 (1990); *Addington v. Texas*, 441 U.S. 418 (1978).

111.    Only business necessity warrants a place of public accommodation or employer to discriminate against someone based on her perceived medical status. 42 U.S.C. § 12101.

112.    The Nuremberg Code-derived governance of medical authority reversed the eugenics-era precedents, empowered individuals with a meaningful participatory role, and empowered democratic oversight, judicial supervision, and procedural safeguards on

the medical regulatory process, enshrining informed consent as the ethical foundation of modern medicine and a fundamental human liberty so universal that courts acknowledge it as a peremptory norm.

***Rushed Drugs & Medical Experiments***

113.    The concern over uninformed, nonconsensual and pharmacological failures haunt the history of rushed drugs, biologics and negligent courts.

114.    From Tuskegee to the military, from the foster homes of young women to the Indian health care services on reservations, from facilities for the mentally ill to jails for women, the least powerful and most trusting have been victimized by government medical experimentation, without recourse or remedy.

115.    Deceptive denial of syphilis treatment, forced sterilizations, testing of radioactive ingredients on unwitting patients, psychological experimentation on unsuspecting students (like the MK-Ultra type testing on Ted Kaczynski at Harvard), the LSD testing on government employees, the chemical testing over San Francisco or in New York City subways, the mustard gas secret tests on drafted soldiers – history has taught us that government must be reined in lest it treat its citizenry as rats in a cage or guinea pigs for experimentation.

116.    In 1955, regulators rushed approval of a polio vaccine that caused an outbreak of polio in hundreds of children, known as the Cutter Incident. Later scholars attributed the blame to the federal government's failures in rushing the product to market. In 1959, the Belgian Congo rushed another polio vaccine.

22

117.    Twenty-five years later, a new virus emerged in the population: AIDS. Detailed

journalistic investigations have attributed it to the use of contaminated monkey kidneys in

the development of polio vaccines. In 1963, Americans discovered that the polio vaccine

from monkey kidneys contained the Simian Virus 40 that could cause cancer in humans.

In 1976, the Ford administration rushed a vaccine for swine flu.

118.    The virus proved less deadly than anticipated, but the vaccine proved far more

dangerous, causing thousands of Americans to develop a serious neurological disorder

known as Guillain-Barre Syndrome, causing paralysis.

119.    As the "60 Minutes" report from the time identified, the FDA was again the source

of failure because of the rushed, pressured political environment of the time. Most

recently, in 2018, the World Health Organization rushed approval of a vaccine against

Dengue Fever, despite warnings from dissident doctors, which left hundreds of children

dead and thousands more injured.

120.    Tyson, in implementing its vaccine mandate and coercing employees to take this

rushed and potentially dangerous vaccine, is continuing this sordid history.

**FIRST CAUSE OF ACTION**
**Religious Discrimination**
**[Violation of the Missouri Human Rights Act; MHRA § 213.010 et seq.]**

121.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

122.    The Missouri Human Rights Act prohibits an employer from "discharg[ing] any

individual, or otherwise to discriminate against any individual with respect to his

23

compensation, terms, conditions, or privileges of employment, because of such individuals . . . religion".

123. A plaintiff establishes a prima facie case of religious discrimination when she demonstrates "1) a bona fide belief that compliance with an employer's requirement would be contrary to his or her religious belief, 2) the employer has been so notified, and 3) the employee was discharged for failing to comply with the requirement." *Sedalia No. 200 Sch. Dist. v. Missouri Comm'n on Hum. Rts.*, 843 S.W.2d 928, 930 (Mo. Ct. App. 1992).

124. The employer has the burden to show that it could not accommodate the employee's beliefs without incurring undue hardship. *Id.*

125. "This accommodation to a religious belief requires the employer to find and utilize alternatives which 1) do not compromise the employment entitlements of others, or 2) which do not require the employer to incur more than a *de minimus* costs." *Id.* (citation omitted).

126. Plaintiff held sincere religious objections to complying with Tyson's COVID-19 vaccine mandate.

127. Plaintiff was subjected to discriminatory treatment and adverse employment action tantamount to termination due to her religious objections to the COVID-19 vaccine.

128. Plaintiff requested and was granted a religious exemption from Tyson's COVID-19 vaccine mandate.

129. Plaintiff made her religious objections known to Defendants.

24

130. Defendants' only accommodation for Plaintiff was one year of unpaid leave, which is akin to termination, with a promise of permanent termination if she did not receive a COVID-19 vaccine at the end of the year.

131. Defendants utterly failed to provide Plaintiff with reasonable accommodations for her religious observances as is required under the Missouri Human Rights Act, as one year of unpaid leave is not reasonable accommodation, but rather a punitive measure taken against employees who choose to exercise their religious rights.

132. Plaintiff informed Defendants that unpaid leave was not an adequate accommodation for her religious observations.

133. Defendants still took adverse employment action against Plaintiff by placing her on unpaid leave and constructively terminating her from her long-held position.

134. By denying reasonable accommodation and executing punitive measures against employees who refrain from obtaining a COVID-19 vaccine on religious grounds, Defendants discriminated against Plaintiff due to her religious beliefs.

135. Defendants' failure to provide religious accommodations has injured and will continue to injure Plaintiff by discriminatorily denying them employment and income. 16. On these facts, Plaintiff establishes a prima facie case that shows Defendants failed to make any reasonable accommodation and violated Plaintiff's religious rights.

136. Defendants cannot show that accommodating Plaintiff would have caused an undue hardship 1) there was evidence that vaccination provided little to no protection against transmission or infection of COVID-19 and was therefore unnecessary to

25

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

protect Tyson's workforce and 2) there was no reasonable justification as to why other safety measures (i.e. testing, masking) could not be implemented.

137. This is further demonstrated by Tyson's change of policy in October 2022 allowing unvaccinated employees to return to their position as of November 2022.

138. "The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual and punitive damages, and may award court costs and reasonable attorney fees to the prevailing party . . ." V.A.M.S. § 213.111(2).

## SECOND CAUSE OF ACTION
### Religious Discrimination
### [Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]

139. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

140. Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).

141. Once an employee has established a prima facie case of discrimination, the burden shifts to the defendant to show that it could not reasonably accommodate the employee without undue hardship.

26

142.    Plaintiff asserts bona fide religious beliefs that conflicted with Tyson's mandatory vaccine policy. In response to her sincere beliefs, Tyson granted religious "exemptions" from its COVID-19 vaccine mandate and subjected Plaintiff to discriminatory treatment.

143.    Defendants' only accommodation for Plaintiff is one year of unpaid leave, which is akin to termination, with a promise of permanent termination if the employee does not receive a COVID-19 vaccine at the end of the year.

144.    Defendants utterly failed to provide Plaintiff with reasonable accommodations for her religious observances as is required under Title VII, as one year of unpaid leave is not reasonable accommodation, but rather a punitive measure taken against employees who choose to exercise their religious rights.

145.    By denying reasonable accommodation and executing punitive measures against employees who refrain from obtaining a COVID-19 vaccine on religious grounds, Defendants discriminated against Plaintiff due to her religious beliefs.

146.    Defendants' failure to provide religious accommodations has injured Plaintiff. Ownby remains on unpaid leave.

147.    On these facts, Plaintiff establishes a prima facie case of discrimination in violation of Plaintiff's Title VII rights.

148.    Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendants to show that they could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper,* at 514. Defendants are unable to make this showing for several reasons.

27

149. First, upon receiving Plaintiff's request for a religious accommodation, Defendants did not give that request the individualized consideration demanded by Title VII. In the EEOC's recent Technical Assistance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", the EEOC addressed this precise issue. See https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021. In the COVID-19 Technical Assistance, the EEOC posed the following question: "Under Title VII, how should an employer respond to an employee who communicates that he . . . is unable to be vaccinated . . . because of a sincerely held religious belief." *Id.* at K.12. The EEOC's response was as follows:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting the COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship . . . . Under Title VII, **an employer should thoroughly consider all possible reasonable accommodations** . . . . In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.

*Id.* (emphasis added). Elsewhere in that document, the EEOC identified the types of reasonable accommodations employers must consider when they receive requests for religious accommodations, including "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment (such as [modification] to ventilation systems or limiting contact with other employees and non-employees," and "regular hand washing." *Id.* at K.5.

28

150.    Here, Defendants failed to "thoroughly consider all possible reasonable accommodations," as required by the EEOC and provided a far cry from the "individualized" assessment required by the EEOC. *Id.* at K.5.

151.    Second, Defendants cannot show that affording Plaintiff the types of accommodations the EEOC identified in the COVID-19 Technical Assistance as being reasonable in the context of employer vaccination policies—i.e., "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it.

152.    This is further demonstrated by the fact that Tyson is now allowing unvaccinated employees who had been placed on unpaid leave to return to their positions.

153.    As previously stated, Defendant cannot show that allowing Plaintiff to continue in her position with alternative reasonable accommodations would have imposed an undue hardship.

154.    As such, Defendants have violated Plaintiff's rights under Title VII by discriminating against her on the basis of religion and failing to provide reasonable accommodations or demonstrate undue hardship.

### THIRD CAUSE OF ACTION
**Disability Discrimination**
**[Violation of the Missouri Human Rights Act; MHRA § 213.010 et seq.]**

155.    Plaintiff hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

156.    The Missouri Human Rights Act also prohibits employment discrimination on the basis of disability.

29

157.   Disability is defined as "a physical or mental impairment which substantially limits one or more of a person's major life activities" or "*being regarded as having such an impairment*". MHRA § 213.010(5) (emphasis added).

158.   Defendants perceived Plaintiff as disabled due to her vaccination status, incorrectly determined that she was unfit to perform her job as a result and took adverse employment action against her as a result.

159.   Defendants engaged in discriminatory activity by failing to conduct an individualized assessment and reasonably accommodate Plaintiff on the basis of her perceived disabilities.

160.   Defendants cannot show that offering alternative, less intrusive accommodations would cause an undue hardship, for the same reasons enumerated above.

## FOURTH CAUSE OF ACTION
### Disability Discrimination
### [Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]

161.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

162.   The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et seq. (hereinafter the "ADA Act") prohibits any covered entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

30

163.    Under the ADA, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "being regarded as having such an impairment []." (*Id.,* at subparagraph (C)). Under section 12102(3)(A) of the ADA Act: "An individual meets the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

164.    "An employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added). The burden of persuasion falls on Tyson.

165.    An employer has a duty under the ADA to engage in an "interactive process" with the employee in an attempt to determine whether, based on an *individualized assessment* of the employee's needs, a reasonable accommodation is possible.

166.    Defendants failed to engage in an interactive process with Plaintiff and to conduct an individualized assessment of her unique circumstances.

31

167.    Tyson discriminated against Plaintiff on the basis of a perceived disability: being unvaccinated.

168.    Defendants regarded unvaccinated individuals as being "disabled" and unable to perform their duties of their employment.

169.    Based on this perceived disability, Defendants discriminated against Plaintiff by threatening termination if they failed to receive the COVID-19 vaccine, a "condition" regarded as a disability under Tyson's policy.

170.    Plaintiff was constructively terminated due to her COVID-19 vaccination status, despite the fact that Plaintiff has successfully performed her same positions from which she were just removed since before COVID-19 was introduced to the world.

171.    By pattern and practice, virtually every employer in America has shown that reasonable accommodations and alternatives to vaccination indeed exist for employees, and these have been required all along since the inception of COVID: self-screening with temperature checks, wearing personal protective equipment (PPE), and complying with other various safety protocols until the number of COVID infections reduced to acceptable levels.

172.    Defendants cannot show that offering alternative, less intrusive accommodations would cause an undue hardship, for the same reasons outlined in the context of Defendants' religious discrimination.

173.    Defendants' failure to provide accommodations has harmed and continues to harm Plaintiff. Injury includes, but is not limited to, coercing employees to take an

32

untested and potentially unsafe substance, and withdrawing the employment, income, and livelihood.

174. By failing to engage in the interactive process, offer any reasonable accommodation, and terminating Plaintiff based on her medical decision, Defendants' discriminatory actions were in violation of the ADA.

## FIFTH CAUSE OF ACTION
### Common Law Assault – Missouri Laws 565.056

175. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

176. Under Missouri state law, a person commits assault who "purposely places another person in apprehension of immediate physical injury." Missouri Laws § 565.056(1)(4)

177. Defendants have threatened intentional, imminent harmful and offensive contact upon Plaintiff by way of forced vaccine injection of an experimental, untested, and ineffective mRNA vaccine, under penalty of being terminated from her employment. A penalty they in fact exercised.

178. Defendants' coercion, emboldened by tight deadlines, uncompromising exemption protocols, and a hostile and censored work environment, contributed to Plaintiff's stress and fear concerning Defendants' vaccine mandate.

179. Defendants' COVID-19 vaccine mandate caused Ownby to reasonably fear imminent bodily injury from being forced to inject an experimental, untested, and potentially unsafe substance into her body, under penalty of termination from employment for failure to comply. A penalty that was in fact exercised by Defendants.

33

180. Plaintiff did not consent to Defendants' conduct, nor did she consent to receiving the COVID-19 vaccine. Defendants' unlawful requirement of employment was an unwelcome invasion of Plaintiff's privacy and bodily integrity.

181. Tyson's vaccine mandate has and continues to cause Plaintiff harm, including but not limited to by way of fear, anxiety, fright over being threatened with the injection of an untested and potentially unsafe substance into the body, and the imminent and subsequent loss of her income and livelihood.

182. Defendants' conduct alleged herein was a substantial factor in causing Plaintiff's harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

a. A finding that Plaintiff has a fundamental right to her bodily autonomy, and to make health decisions in accordance with her beliefs and conscience.

b. A finding that Defendants Tyson Foods and Tyson Deli discriminated against Plaintiff in violation of the Missouri Human Rights Act, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act.

c. Enjoin Defendants from taking any further adverse employment action against Plaintiff;

d. Enjoin Defendants from taking any similar discriminatory adverse employment action against any other Tyson employee;

Electronically Filed - Lafayette - November 09, 2022 - 04:52 PM

e.       An order that Plaintiff be compensated, to the extent allowable under Missouri

state and Federal law, for her monetary damages;

f.       An order that Defendants pays Plaintiff's costs associated with bringing this

lawsuit, including her reasonable attorneys' fees and costs; and

g.       A grant of any such further relief as the Court deems necessary and proper in the

public interest.



             Respectfully submitted,

             */s/ Ross H. Briggs*
             Ross H. Briggs MBE #31633
             4144 Lindell Blvd., suite 202
             St. Louis, MO 63108
             (tel) 314-652-8922
             (cell) 314-852-8293
             r-briggs@sbcglobal.net

             Robert E. Barnes, Esq.
             *Subject to admission pro hac vice*
             Lexis Anderson, Esq.
             *Subject to admission pro hac vice*
             BARNES LAW
             700 South Flower Street, Suite 1000
             Los Angeles, California 90017
             Telephone: (310) 510-6211
             robertbarnes@barneslawllp.com
             lexisanderson@barneslawllp.com